|  | AUSA:  Gejaa Gobena | Telephone:  (202) 550-2879 |
| Special Agent: | Bryan Drake, FBI | Telephone:  (313) 965-5884 |

AO 106 (Rev. 04/10) Application for a Search Warrant

# ORIGINAL   UNITED STATES DISTRICT COURT

SEALED MATTER

for the
Eastern District of Michigan

33

| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) |
| EMAIL ACCOUNT OF faridfata@hotmail.com THAT IS STORED | ) |
| AT PREMISES CONTROLLED BY MICROSOFT CORPORATION | ) |
|  | ) |

Case No.  13-MC-51194-F

F I L E D
NOV 22 2013
CLERK'S OFFICE
DETROIT

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

located in the Eastern _____ District of Michigan _____, there is now concealed *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

The basis for the search under Fed.R.Crim.P.41(c) is *(check one or more)*:

- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 42 U.S.C.§1320a7b(1)(A) - 1320a7b(2)(A) | Payment or Receipt of Health Care kickbacks; Health Care Fraud; and |
| 18 U.S.C. §1347; ~~18 U.S.C. §1342(a)~~ *BD DR* | ~~Unlawful Procurement of Naturalization~~  *BD DR* |

The application is based on these facts:

See attached AFFIDAVIT.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Bryan Drake, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  November 22, 2013 _____

_____
*Judge's signature*

City and state:  Detroit, Michigan _____

Honorable David R. Grand, U.S. Magistrate Judge
*Printed name and title*

# ATTACHMENT A

## I. Search Procedure

The search warrant will be faxed to Microsoft Corporation personnel who will be directed to produce those accounts and files described in Section II below.

## II. Files and Accounts to be Produced

a.  All stored electronic mail and other stored content information presently contained in, or on behalf of, the following electronic mail addresses and/or individual accounts:

**faridfata@hotmail.com**

b.  All existing printouts from original storage of all of the electronic mail described above in Section II (a);

c.  All transactional information of all activity of the electronic mail addresses and/or individual accounts described above in Section II(a), including log files, dates, times, methods of connecting, ports, dial-ups, and/or locations;

d.  All business records and subscriber information, in any form kept, pertaining to the electronic mail addresses and/or individual accounts described above in Section II(a), including applications, subscribers' full names, all screen names associated with the subscribers and/or accounts, all account names

associated with the subscribers, methods of payment, telephone numbers, addresses, and detailed billing records; and

    e.  All records indicating the services available to subscribers of the electronic mail addresses and/or individual accounts described above in Section II(a).

## **ATTACHMENT B**

### **Particular Things to be Seized**

**I.      Information to be disclosed by Microsoft Corporation**

To the extent that the information described in Attachment A is within the possession, custody, or control of Microsoft Corporation, Microsoft Corporation is required to disclose the following information to the government for each account or identifier listed in Attachment A for information stored on and after January 1, 2007.

a.      The contents of all e-mails stored in the account, including copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods

of connecting, log files, and means and source of payment (including any credit or bank account number);

    c.    All records or other information stored by an individual using the account, including chat logs, address books, contact and buddy lists, calendar data, pictures, and files;

    d.    All records pertaining to communications between Microsoft Corporation and any person regarding the account, including contacts with support services and records of actions taken.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of federal law, including Title 18, United States Code, Section 371 (Conspiracy to Defraud the United States and to Pay Health Care Kickbacks), Title 18, United States Code, Section 1347 (Health Care Fraud), and Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud), inter alia, by Farid Fata and others known and unknown since August, 2007, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.      Communications regarding payments to or from Medicare, the recruitment of Medicare beneficiaries, lists of Medicare beneficiaries, Medicare beneficiary information, the payment of Medicare beneficiaries, and any other the preparatory steps in furtherance of the scheme to pay kickbacks or to defraud Medicare.

b.      Records relating to who created, used, or communicated with the account or identifier, including records about their identities and whereabouts.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN THE MATTER OF THE SEARCH
OF INFORMATION ASSOCIATED
WITH faridfata@hotmail.com THAT IS
STORED AT PREMISES
CONTROLLED BY Microsoft
Corporation

Case No. 13-MC-51194-F

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Bryan Drake, being first duly sworn, hereby depose and state as follows:

## I.   INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application for a search
warrant for information associated with a certain e-mail account that is stored at
premises owned, maintained, controlled, or operated by Microsoft Corporation,
an e-mail provider headquartered at One Microsoft Way, Redmond,
Washington.  The information to be searched is described in the following
paragraphs and in Attachment A.  This affidavit is made in support of an
application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and
2703(c)(1)(A) to require Microsoft Corporation to disclose to the government
records and other information in its possession pertaining to the subscriber or
customer associated with the accounts, including the contents of
communications.

2.    I am a Special Agent with the Federal Bureau of Investigation
(FBI), currently assigned to the FBI Detroit Division to investigate health care

fraud violations, including schemes to defraud the Medicare and Medicaid programs. During my tenure with the FBI, I have participated in a variety of criminal health care fraud investigations and cyber national security investigations, during the course of which I have interviewed witnesses, conducted physical surveillance, executed search warrants, and reviewed email records, Medicare claims data, bank records, phone records, Medicare and Medicaid beneficiaries' medical records, invoices, and other business records. I am familiar with the records and documents maintained by health care providers and the laws and regulations related to the administration of the Medicare and Medicaid programs.

3.     In my capacity as an investigator, I investigate white collar crimes that often involve the use of computers to commit violations of federal laws. I have gained experience regarding the use of computers and the Internet in criminal activity, and the investigation of such activities, through formal training at the FBI Academy and in everyday work relating to these types of investigations.

4.     I have personally participated in the investigation of the offenses described above, and am familiar with the relevant facts and circumstances. The facts and information contained in this Affidavit are based upon my knowledge and observations, information obtained from records obtained in the course of this investigation, information from other experienced FBI agents and agents from the United States Department of Health and Human Services Office of Inspector General (HHS-OIG) and Internal Revenue Service (IRS), and information gained from my training and experience.

5.      Because this Affidavit is being submitted for the limited purpose of seeking a search warrant, I have not set forth each and every fact learned during the course of this investigation, but simply those facts that I believe are necessary to establish probable cause to support the issuance of a search warrant.  Except where otherwise noted, all conversations described in this Affidavit are set forth in part and in substance only.

6.      Based on the facts set forth in this Affidavit, I respectfully submit that there is probable cause to believe that there presently is located in the Microsoft email account faridfata@hotmail.com certain items, which are more fully set forth in Attachment B, which constitute evidence, fruits and instrumentalities of violations, and attempted violations of Title 18, United States Code, Title 42, United States Code, Sections 1320a-7(b)(1)(A) and 1320a-7(b)(2)(A), Payment or Receipt of Health Care Kickbacks, Title 18, United States Code, Section 1347 (Health Care Fraud), ~~Title 18 United States Code 1342(a) (Unlawful Procurement of Naturalization),~~ *inter* alia. *BD* *RV*

## II.      FACTS SUPPORTING PROBABLE CAUSE

7. Evidence uncovered in the investigation of Dr. Fata has systematically defrauded Medicare and private insurers by submitting false claims for services that were medically unnecessary, including infusion therapy treatments, including chemotherapy;  Positron Emission Tomography (PET) scans (used to detect cancer) and a variety of cancer and hematology treatments for patients who did not need them.  This investigation has uncovered evidence that Dr. Fata (1) administered and fraudulently billed unnecessary infusion therapy treatments, (2) solicited and received health care kickbacks, and (3) directed his

3

staff to lie to patients and insurance companies in order to justify unnecessary diagnostic testing, such as positron emission tomography (PET) scans.

8.  During the course of my investigation, I have determined that Dr. Fata used his faridfata@hotmail.com email address to communicate regarding all parts of the scheme, including with his employees, pharmaceutical representatives, financial advisors, and other individuals regarding billing, treatment and other aspects of his practice.

### A.      Dr. Fata Background

9.  Dr. Fata is a medical doctor licensed in the state of Michigan and the sole owner of Michigan Hematology Oncology, P.C. ("MHO"), a hematology oncology medical practice incorporated in 2005 with six locations in Rochester Hills, Clarkston, Bloomfield Hills, Sterling Heights, Lapeer, Troy and Oak Park, Michigan.

10.     From approximately August 2007, through in or around August 2013, MHO submitted approximately $225 million in claims to Medicare, of which approximately $109 million was for chemotherapy or other cancer treatment drugs. Of the approximate $225 million, Medicare paid over $91 million, of which over $48 million was for chemotherapy or other cancer treatment drugs.

### B.      Solicitation of Kickbacks

11.     Dr. Fata incorporated a charity known as Swan for Life Cancer Foundation ("Swan for Life") in or around January 2009 that purported to provide supportive care for patients in his practice.  The most recent annual report for Swan for Life dated on or about August 5, 2013 and filed on or about September 30, 2013 lists the president and registered agent as Dr. Fata.  Swan

4

for Life's mailing address is MHO's Rochester Hills practice address, and Dr. Fata's home address is listed as the registered office.

12.     Swan for Life employed social workers and grant writers who sought assistance from various sources, including pharmaceutical manufacturers. Swan for Life operated from Dr. Fata's MHO offices in Rochester Hills and Clarkston.

13.     Dr. Fata and Swan for Life solicited pharmaceutical representatives for donations in exchange for continuing to use their drug products. The donations came in the form of "educational grants" from certain pharmaceutical companies to Swan for Life.  To avoid paying kickbacks or the appearance of paying kickbacks to doctors who are ordering their drugs, pharmaceutical manufacturers typically keep the grant request process separate from the pharmaceutical sales process.  AMAG, the manufacturer of a drug called Feraheme, an iron infusion therapy that the evidence shows was over-utilized by Dr. Fata, had such a separate grant process.

14.     A grant writer for Swan for Life, J.L., stated that Dr. Fata ordered her to call pharmaceutical representatives and solicit them for grants.  Dr. Fata would routinely check with her to see the progress of the Swan for Life grants process, often by email.  Dr. Fata's wife, who is the Chief Financial Officer of MHO, would ask J.L. to keep a donor database for Swan for Life. J.L. believed that Dr. Fata treated Swan for Life more as a marketing arm for MHO than a charity.

15.     J.L. provided to agents copies of a series of emails between Dr. Fata, J.L. and a pharmaceutical representative regarding a grant request that Swan for Life had made.  On July 12, 2011, J.L. sent an email to faridfata@hotmail.com, the pharmaceutical manufacturer representative and a

5

third address associated with MHO regarding the fact that Swan for Life's grant had been rejected.

16.     In response to the July 12, 2011 email forwarding the AMAG rejection, Dr. Fata wrote from faridfata@hotmail.com to the pharmaceutical representative, Swan for Life grant writer and separate MHO email address:

> I expect further support from AMAG.
>
> Please proceed ASAP
>
> I will be happy to talk to Dr Straus to reconsider
>
> IF ANYBODY DESERVES SUPPORT IS US! i.e. SFLCF
>
> Please advice
>
> Dr. Fata

17.     The grant writer J.L. informed agents that shortly after Dr. Fata sent this email, J.L. received a phone call from the AMAG pharmaceutical manufacturer representative.  The representative was upset because Dr. Fata had told her that her company had to donate $10,000 to Swan for Life or he would stop ordering the drug that the manufacturer produced.  During the investigation, we have, in consultation with experts retained by the government, uncovered evidence that Dr. Fata infused numerous patients with AMAG's Feraheme (an infused iron supplement that is reimbursed at a high amount by insurance companies), often with the false diagnosis that they were suffering from iron-deficiency anemia.  It was a mutually beneficial arrangement where Dr. Fata made money off insurance reimbursements for providing Feraheme and AMAG made money off of the high volume of sales of Feraheme to Dr. Fata's practice.

18.     In addition to soliciting kickbacks from pharmaceutical manufacturers, the investigation has revealed evidence that Dr. Fata received kickbacks for referring home health care and hospice services.

6

19.     MHO office manager G.K. previously worked for a company known as Guardian Angel Home Care.  While at Guardian Angel, G.K. was instructed to find "medical directors" for home health care companies in Ohio. According to G.K., the medical directors were not really providing any medical oversight of Guardian Angels; they were being compensated for referrals to Guardian Angel.

20.     Dr. Fata was a medical director for Guardian Angel.  He received $1000 monthly checks from Guardian Angel in 2010 and 2011.  His referrals rose after those payments commenced.   In 2009, he referred only one Medicare beneficiary to Guardian Angel Home Care and one to Guardian Angel Hospice.

21.     In 2010, he referred 49 Medicare beneficiaries for services with Guardian Angel Homecare and 23 Medicare beneficiaries to Guardian Angel Hospice.  In 2011, he referred 48 Medicare beneficiaries for services with Guardian Angel Homecare and 39 Medicare beneficiaries to Guardian Angel Hospice.

22.     Dr. Fata placed the owner of Guardian Angel on the board of directors for Swan for Life.  Grant writer J.L. reported that Swan for Life advertised Guardian Angel as a part of Swan for Life.

### C.        Dr. Fata's Pharmacy

23.     Dr. Fata incorporated a pharmacy known as Vital Pharmacare LLC ("Vital") located inside MHO's Rochester Hills location. According to Articles of Organization filed with LARA, Susan R. McMaster formed MHO Pharmacy Services LLC on or about December 26, 2012. Dr. Farid Fata was listed as the registered agent and the registered office was listed as 1901 Star-Batt Drive, Suite 200, Rochester Hills, Michigan. On the same day, a certificate of assumed name was filed with LARA listing the assumed name Michigan

Hematology Oncology Pharmacy Services. A second certificate of assumed name was filed with LARA on February 15, 2013 and listed the assumed name Hope Specialty Pharmacy. Six days later, on February 21, 2013, the Articles of Organization were amended; documents filed with LARA changed the official corporate name to Vital Pharmacare LLC. On the same day, another certificate of assumed name was filed with LARA listing the assumed name MHO Pharmacy Services.

24. According to a medical assistant, D.M., after the pharmacy opened MHO employees were directed to order all oral chemotherapy drugs through his pharmacy. Interviews with patients confirm that they also felt pressure to fill their oral medications through Vital, even if their medication was not readily available. At times, that pharmacy was unable to provide the drug on the same day, so D.M. wanted to order from a different pharmacy. She believed Dr. Fata was unhappy when orders went through other pharmacies.

25. Dr. Fata directed his staff on what to order from Vital from his faridfata@hotmail.com account, as is evidenced by a May 19, 2013 email to MHO physician and nurse practitioners which stated, "Dear All, I just want to share that Vital Pharmacare will start delivering oral kytril 1mg BID for post chemo nausea prevention. Kytril is present on the shelf and available for immediate dispense. It will replace oral zofran. Thank you for your cooperation  Dr. Fata."

**D.       Medically Unnecessary Infusion Therapy Treatments**

26. Evidence from MHO office staff, doctors, nurses, as well as independent experts, supports the conclusion that Dr. Fata ordered medically unnecessary infusion therapy treatments so that he could bill them through MHO.

27.     The nurse infusion manager, C.G., for MHO confirms that on numerous occasions Dr. Fata asked her to check billing amounts for infusions, including the amount that could be billed if an infusion time was increased, and would then order the treatments to be performed in the manner that resulted in the highest possible reimbursement.

28.     In 2007, C.G. told agents that Dr. Fata was administering numerous infusion drugs over an excessively-extended time period to maximize his reimbursements. C.G. provided examples of how Dr. Fata infused the drugs he prescribed to his patients.

29.     For example, Dr. Fata infused the drug Aloxi over twenty minutes, while the manufacturer stated it should be administered to the patient as an IV push. Administering Aloxi that way increased MHO's reimbursement for how they gave the drug to the patient. Dr. Fata was confronted about this by C.G.; Dr. Fata told C.G. to continue to administer Aloxi as a twenty minute infusion.

30.     Another example involved the drug Vidaza. Dr. Fata directed his staff to infuse the drug Vidaza over a sixty minute drip as opposed to it being administered over ten minutes as per the drug's package insert. Dr. Fata was confronted by C.G. about this; again, Dr. Fata would not allow C.G. to change the infusion regimen.

31.     Finally, Dr. Fata infused the drug Gemzar over a two hour period when the manufacturer's instructions stated it should be administered over a thirty minute infusion. C.G. confronted Dr. Fata this infusion and he told C.G. there was a study out of Texas that suggested Gemzar could be infused over the longer time period. MHO only changed how they infused Gemzar after a patient had adverse side effects from the two hour infusion.

32.     Dr. Fata's business model relied not only on unnecessary infusions, but high volume.  For instance, at one time Dr. Fata asked C.G. to check the reimbursement rate for the Folfox chemotherapy infusion regimen which consisted of two drugs, Oxaliplatin and Leucovorin, being infused.  Dr. Fata wanted to know the difference in the billing for infusing these drugs together over two hours versus an infusion over three hours.  The manufacturer states Oxaliplatin has to be infused over a two hour time period and Leucovorin is to be infused over a one hour time period.  The manufacturer also states the two drugs should be infused simultaneously using a Y-line infusion.

33.     C.G. learned from the billing department at MHO that infusing these drugs separately provided a reimbursement of $22 more than if Dr. Fata infused them together as instructed by the manufacturer.  C.G. told Dr. Fata the difference in reimbursement was only $22.  Dr. Fata told C.G. that it was not just $22; it was $22, $22, $22 over and over again.

34.     Another example of medically unnecessary drug therapy was Dr. Fata's use of IV/IG infusions. The overutilization of IV/IG infusion treatments was reported to agents by multiple MHO employees.  Specifically, Dr. Fata inappropriately and repeatedly ordered a drug known as Octagam, an intravenous immunoglobulin ("IV/IG"), be given to patients who did not need it.  These patients were required to receive three to four hour infusions of Octagam, at a cost of thousands to insurance companies, which were completely medically unnecessary.

35.     Indeed, even in his arrest interview, Dr. Fata admitted that IVIG treatments had been "over utilized."

10

36.     Multiple nurses became concerned with the overutilization of IV/IG treatments.  In particular, infusion nurse M.S. who was a nurse at Beaumont Hospital working for approximately 8 doctors with a larger patient population than Dr. Fata's, reported she saw approximately 2-3 patients per month coming in for IV/IG at that location.  By contrast, M.S. estimated that she saw 50 patients per month coming to the Clarkston MHO location for IV/IG treatment.

37.     IV/IGs are only appropriate for patients with low IgG levels and recurrent infections.  M.S. pulled 40 patient files for patients who were scheduled to receive these treatments and discovered 38 of the patients did not need IV/IG treatment.

38.     M.S. took this issue up with another nurse practitioner and the infusion therapy manager.  The employees agreed to discharge the 38 patients whose condition did not justify the three to four hour IV/IG treatments Dr. Fata was ordering them to receive.

39.     Dr. Fata used his faridfata@hotmail.com account to discuss infusion treatments with his office staff.  S.P. worked for MHO, primarily checking patient insurance and coverage in various programs.  S.P. also worked with patients to assist them in finding financial assistance, such as through co-pay programs.

40.     S.P. provided a copy of a July 10, 2013 email that she sent to faridfata@hotmail.com and on which she carbon copied nurse practitioner K.M. The subject of the email was "[Patient M.R.]."  The content of the email was, "Dr. Fata, Prolia was requested for this patient, however it requires prior auth and HAP wants T –scores which we do not have. We can give the patient

11

Zometa which does not require prior auth.  Do you want to give zometa or get a bone density done?  Thanks, [S.P.].”

41.    Dr. Fata sent a reply from faridfata@hotmail.com to S.P. with a carbon copy to nurse practitioner K.M.  The subject of the email was, “RE: Mary Rosales.”  The content of the email was, “zometa is ok.”

42.    Your Affiant believes that, based on the emails obtained to date, additional evidence relating to Dr. Fata’s infusion therapy practices will be found in emails to and from faridfata@hotmail.com.

### E.    PET Scans

43.    According to Articles of Organization filed with LARA, Dr. Farid Fata incorporated United Diagnostics PLLC on or about November 1, 2012.  The Articles listed Dr. Fata as the Organizer and Resident Agent at the registered office, which was listed as his Rochester Hills MHO practice. According to the filing, the company was organized for the sole and specific purpose of rendering “diagnostic services provided by a licensed physician.”

44.    Dr. Fata leased a PET scan machine for United Diagnostics, intended to test for cancer.

45.    After opening United Diagnostics in late 2012, employees including medical assistant D.M. report that Dr. Fata ordered patients to be sent to his facility for PET scans rather than other facilities.  When United Diagnostics was delayed in its opening from spring until summer 2013, Dr. Fata ordered the patients’ tests to be rescheduled.

46.    When patients raised concerns about having their cancer testing delayed, Dr. Fata told E.S. to tell these patients that their insurance company was

declining coverage of the PET scan and that they needed to wait a month before requesting another PET scan. On at least one occasion E.S. was challenged by one of Dr. Fata's patients regarding her insurance coverage. The patient told E.S. she had already checked with her insurance company before E.S. called and they had already approved her PET scan. As part of the PET scan claims review process, Dr. Fata spoke to Blue Cross/Blue Shield of Michigan (BCBSM) third party contractors in what is known as a "peer-to-peer" review. The records of those conversations have been obtained from BCBSM.

47.     In at least one instance in July 2011, BCBSM records reflect that Dr. Fata informed BCBSM that the patient's cancer "tumor marker" was rising and that she had reported abdominal pain, justifying the PET scan. Review of her file by an expert shows that her "tumor marker" was, in fact, stable. The patient, M.C., reports that Dr. Fata told her that her tumor marker was stable and that this test was merely to verify that her cancer was gone. She also stated that she had not reported any abdominal pain to Dr. Fata.

48.     Dr. Fata used faridfata@hotmail.com to discuss with MHO employee S.P., nurse practitioner K.M. and office manager I.D., whether a patient's insurance could cover the cost of his treatments, including PET scans. An exchange on this subject occurred between the three in May 2013, in which he stated in one email regarding coverage, "I agree that the wife wants to guarantee the coverage first, therefore should hold treatment and obtain a PET meanwhile [I.D. and K.]:  please proceed on the PET   [K.M.] will evaluate clinically and get back to me."

49.     Your Affiant believes that, based on the emails obtained to date, additional evidence relating to Dr. Fata's PET scan practices will be found in emails to and from faridfata@hotmail.com.

**F.        Financial Dealings**

50.     Dr. Fata routinely utilized his faridfata@hotmail.com email account to manage his finances with the assistance of CIG Corporation, which managed tens of millions of dollars for Dr. Fata.  Your Affiant and other law enforcement agents are investigating and attempting to trace tens of millions of dollars that flowed through numerous Dr. Fata-related entities associated with CIG.

51.     Dr. Fata constantly communicated through email with O.M., of CIG Corporation about transferring pre-tax money overseas, including proceeds from the fraud scheme.  For example, on February 1, 2010, Dr. Fata sent an email to O.M. from faridfata@hotmail.com with the subject line, "Sending money to Lebanon."  The content of the email stated, "[O.M.], I have not heard from you in regards to sending the money to Lebanon.  we NEED TO WORK ON IT asap.  Pre-taxed money would be optimal... Dr Fata"

52.     On June 6, 2010, Dr. Fata using email address faridfata@hotmail.com, sent an email to O.M. with subject "IMPORTANT." The content of the email stated, "Osman, 1- What documents are needed/required from [Mrs. Fata] and [Fata's accountant] to complete the paperwork from Lebanon  2- The stock market in the US continues to fall as well as the EURO.  Should we buy now (stock/mutual funds)? LET ME KNOW ASAP!  Dr. Fata"

14

53. On August 23, 2010, Dr. Fata using faridfata@hotmail.com, sent an email to O.M. and himself at faridfata@hotmail.com. The subject of the email was "URGENT!!!!!" The content of the email was, "[O.M.], I need a favor from you. My dad has a great deal on a castle all furnished in Adma/Lebanon! (Above JOUNIEH) Can you pls get in contact with my dad and go see the house! It is for $3000000/- The owners of the house need to sell it to come to USA for their kids college….. Let me know if you can see the house. What is the economic benefit and the housing market in Adma? Is there an economical value in investing in such house?"

54. Dr. Fata further asked if it could be funded from one of his numerous trusts: "Can this be funded from Fata Foundation? Pls advise! DR Fata"

### G. Pharmaceutical Ordering

55. Dr. Fata also communicated regularly with his supplier of pharmaceuticals, Oncology Supply on a regular basis. Oncology Supply representatives said Dr. Fata's ordering of the pharmaceutical drugs, specifically Feraheme, was highly unusual. They specifically noted how unusual the use of the quantity was for a practice of MHO's size. [

56. Dr. Fata had numerous email exchanges from his faridfata@hotmail.com account with Oncology Supply representatives regarding the terms of his contract and ordering. He also set forth his intention to grow the amount of drugs he was ordering.

57. For instance, on October, 25, 2010, Dr. Fata sent an email from faridfata@hotmail.com to Oncology Supply representative J.J. and CIG's O.M. The subject of the email was "Oncology Consortium." The email read, "John, MHO has been approached by other practices to join efforts together to buy

medications through us being an LPP excel Today, MHO has now a volume of approximately 40 million/yr  We need to work the model together.  I asked osman from CIG corporation to call you at 317 716 6422 to discuss the model  Our projected goal is to go to the higher tier of 75 million as discussed with you earlier last year  Dr Fata"

58.    On December 1, 2010, Oncology Supply representative J.J.  sent an email to Dr. Fata at faridfata@hotmail.com and carbon copied another representative and going into detail about contract negotiations and discounts that they could provide to Dr. Fata due to the volume of his business.

59.    Agents also interviewed J.D., who was an account manager at a company called Ion Solutions (Ion).  Ion was a group purchasing organization that Dr. Fata belonged to, along with other oncology practices.  J.D. told agents that he routinely sent Dr. Fata emails at faridfata@hotmail.com, including the analyses of the profits Dr. Fata would earn based on the margin or "spread" between the price Ion offered for the drugs Dr. Fata purchased and reimbursement rates from insurance reimbursements. Overutilization by Dr. Fata of drugs noted above, such as Feraheme and Octagam, meant higher profits for Dr. Fata and MHO overall and was likely a motive for Dr. Fata's conduct set forth above.

## III.    ELECTRONIC INFORMATION

60.    In my training and experience, I have learned that Microsoft Corporation provides a variety of on-line services, including electronic mail ("e-mail") access, to the general public.  Microsoft Corporation allows subscribers to obtain e-mail accounts at the domain name hotmail.com, like the e-mail account listed in Attachment A.  Subscribers obtain an account by

registering with Microsoft Corporation.  During the registration process, Microsoft Corporation asks subscribers to provide basic personal information. Therefore, the computers of Microsoft Corporation are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Microsoft Corporation subscribers) and information concerning subscribers and their use of Microsoft Corporation services, such as account access information, e-mail transaction information, and account application information.

61.    In general, an e-mail that is sent to a Microsoft Corporation subscriber is stored in the subscriber's "mail box" on Microsoft Corporation servers until the subscriber deletes the e-mail.  If the subscriber does not delete the message, the message can remain on Microsoft Corporation servers indefinitely.

62.    When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to Microsoft Corporation's servers, and then transmitted to its end destination.  Microsoft Corporation often saves a copy of the e-mail sent.  Unless the sender of the e-mail specifically deletes the e-mail from the Microsoft Corporation server, the e-mail can remain on the system indefinitely.

63.    A sent or received e-mail typically includes the content of the message, source and destination addresses, the date and time at which the e-mail was sent, and the size and length of the e-mail.  If an e-mail user writes a draft message but does not send it, that message may also be saved by Microsoft Corporation but may not include all of these categories of data.

64.    A Microsoft Corporation subscriber can also store files, including e-mails, chat logs, address books, contact or buddy lists, calendar data, pictures, and other files, on servers maintained and/or owned by Microsoft Corporation

17

65.     Subscribers to Microsoft Corporation might not store on their home computers copies of the e-mails stored in their Microsoft Corporation account.  This is particularly true when they access their Microsoft Corporation account through the web, or if they do not wish to maintain particular e-mails or files in their residence.

66.     In general, e-mail providers like Microsoft Corporation ask each of their subscribers to provide certain personal identifying information when registering for an e-mail account.  This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).

67.     E-mail providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Microsoft Corporation's website), and other log files that reflect usage of the account.  In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

68.     In some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  E-mail

18

providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

69.    In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

## IV.    INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

70.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Microsoft Corporation to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

71.    Based on the forgoing, I request that the Court issue the proposed search warrant.

72.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that- has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

73.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Bryan Drake
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on 11/22/13        .

HONORABLE DAVID R. GRAND
UNITED STATES MAGISTRATE JUDGE

| | AUSA: | Gejaa Gobena | Telephone: (202) 550-2879 |
|---|---|---|---|
| AO 93 (Rev. 12/09) Search and Seizure Warrant | Special Agent: | Bryan Drake, FBI | Telephone: (313) 965-5884 |

# ORIGINAL

# UNITED STATES DISTRICT COURT

for the

Eastern District of Michigan

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
EMAIL ACCOUNT OF faridfata@hotmail.com
THAT IS STORED AT PREMISES CONTROLLED BY
MICROSOFT CORPORATION

)
)
)
)
)
)

Case No. 13-MC-51194-F

**F I L E D**

NOV 22 2013

CLERK'S OFFICE
DETROIT

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____Michigan_____
*(identify the person or describe the property to be searched and give its location):*
See ATTACHMENT A.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):*
See ATTACHMENT B.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before  December 6, 2013
                                                             *(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.      ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
Duty Court Magistrate Judge                          .
                    *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30).*
                              ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:  11/22/13  at 3:05 pm          _____
                                                                    *Judge's signature*

City and state:     Detroit, Michigan          _____Honorable David R. Grand, United States Magistrate Judge_____
                                                                    *Printed name and title*

## ATTACHMENT A

**I. Search Procedure**

The search warrant will be faxed to Microsoft Corporation personnel who will be directed to produce those accounts and files described in Section II below.

**II. Files and Accounts to be Produced**

a.   All stored electronic mail and other stored content information presently contained in, or on behalf of, the following electronic mail addresses and/or individual accounts:

**faridfata@hotmail.com**

b.   All existing printouts from original storage of all of the electronic mail described above in Section II (a);

c.   All transactional information of all activity of the electronic mail addresses and/or individual accounts described above in Section II(a), including log files, dates, times, methods of connecting, ports, dial-ups, and/or locations;

d.   All business records and subscriber information, in any form kept, pertaining to the electronic mail addresses and/or individual accounts described above in Section II(a), including applications, subscribers' full names, all screen names associated with the subscribers and/or accounts, all account names

associated with the subscribers, methods of payment, telephone numbers, addresses, and detailed billing records; and

e.   All records indicating the services available to subscribers of the electronic mail addresses and/or individual accounts described above in Section II(a).

## ATTACHMENT B

### Particular Things to be Seized

**I.**     **Information to be disclosed by Microsoft Corporation**

To the extent that the information described in Attachment A is within the possession, custody, or control of Microsoft Corporation, Microsoft Corporation is required to disclose the following information to the government for each account or identifier listed in Attachment A for information stored on and after January 1, 2007.

a.     The contents of all e-mails stored in the account, including copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods

of connecting, log files, and means and source of payment (including any credit or bank account number);

c.     All records or other information stored by an individual using the account, including chat logs, address books, contact and buddy lists, calendar data, pictures, and files;

d.     All records pertaining to communications between Microsoft Corporation and any person regarding the account, including contacts with support services and records of actions taken.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of federal law, including Title 18, United States Code, Section 371 (Conspiracy to Defraud the United States and to Pay Health Care Kickbacks), Title 18, United States Code, Section 1347 (Health Care Fraud), and Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud), inter alia, by Farid Fata and others known and unknown since August, 2007, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.      Communications regarding payments to or from Medicare, the recruitment of Medicare beneficiaries, lists of Medicare beneficiaries, Medicare beneficiary information, the payment of Medicare beneficiaries, and any other the preparatory steps in furtherance of the scheme to pay kickbacks or to defraud Medicare.

b.      Records relating to who created, used, or communicated with the account or identifier, including records about their identities and whereabouts.